```
 1                IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF ARKANSAS
 2                     FAYETTEVILLE DIVISION

 3    HENRY LAW FIRM,             )
                                  )
 4                 PLAINTIFF,     )
                                  )
 5    VS.                         )
                                  ) CASE NO. 5:18CV-5066
 6                                )
      CUKER INTERACTIVE, LLC      )
 7    AND ADEL ATALLA             )
                   DEFENDANTS.    )
 8                                )

 9         -----------------------------------

10           ORAL AND VIDEOTAPED DEPOSITION OF

11               MARK MURPHEY HENRY

12                 DECEMBER 14, 2018

13         -----------------------------------

14

15      ORAL AND VIDEOTAPED DEPOSITION OF

16    MARK MURPHEY HENRY, produced as a witness at the

17    instance of the DEFENDANTS, and duly sworn, was taken

18    in the above-styled and numbered cause on the 14th of

19    December, 2018, from 9:01 a.m. to 3:45 p.m., before

20    Jennifer Norman, CCR in and for the State of Arkansas,

21    reported by machine shorthand, at the Chancellor

22    Hotel, 70 North East Avenue, Fayetteville, Arkansas

23    72701, pursuant to the Arkansas Rules of Civil

24    Procedure.

25
```

```
 1                A P P E A R A N C E S

 2      FOR THE PLAINTIFF:

 3         MR. TIM CULLEN
           Cullen & Co., PLLC
 4         321 Fairfax Avenue
           Little Rock, Arkansas 72205
 5         501-370-4800
           Tim@cullenandcompany.com
 6
        FOR THE DEFENDANTS:
 7
           MS. DEBORAH A. WOLFE
 8         Wolfe Legal Group, P.C.
           402 West Broadway
 9         Suite 400
           San Diego, California 92101
10         619-234-3363
           Dwolfe@wolfelegalgroup.com
11

12      ALSO PRESENT:

13         Mr. Garrett Smelley,
               Certified Legal Video Specialist,
14
           Ms. Jessica Guarino
15

16

17

18

19

20

21

22

23

24

25
                                                          2
```

1    that his daughter has a home anyway.

2                And then number three, that they also

3    proceed forward with litigation financing and secure

4    that from any source possible.

5    Q.  And to your recollection, was that contained in

6    your March 4th e-mail?

7    A.  I'd be happy to look at the March 4th e-mail and

8    give context to that if you have it.

9    Q.  I'm not sure I do.  That's why I'm asking you.  If

10   I come across it, I'll put it up there.

11   A.  I mean, I guess in further statement of your

12   Exhibit 4, it says:  We discussed how you have had

13   three different law firms.  I understand there's a

14   rational explanation as to why those firms are no

15   longer representing you.

16               I mean, yeah, Adel Atalla absolutely knew

17   what he was doing in signing the guarantee, and we

18   spoke of his assets even.

19   Q.  In your agreement, Exhibit 3, paragraph 4,

20   entitled "Compensation," indicates that you'll bill

21   for Adam Hopkins at the rate of $245 per hour,

22   correct?

23   A.  Yes.

24   Q.  And --

25   A.  Early in the relationship, yes.

1    Q.   Okay.  And was that the same rate at which your

2    firm billed for Mr. Hopkins' time on other matters

3    during the same period?

4    A.   Same or less, yeah.  Adam Hopkins had at the time

5    been an attorney for 11 years maybe or 10 years, and

6    has a lot of federal court experience.  He wasn't a

7    federal law clerk, but he was -- he's done a lot of

8    work with me in the complex litigation.

9    Q.   Is he a patent lawyer?

10   A.   No.  He has accounting training, and he's an

11   exceptional, gifted writer.

12   Q.   And what -- he works now with you at the Rose Law

13   Firm, I think you've testified.  What is his usual

14   hourly billing rate now?

15   A.   Maybe 275.  Some clients 265.  I have -- we have a

16   hybrid agreement with another case on an antitrust

17   thing where he's more than that, but then we have a

18   hybrid agreement on a qui tam case where I take an

19   interest, some percentage in any recoveries that way

20   he's lower than that.  So it's maybe 200 in that, but

21   it's offset by an interest in the case.

22   Q.   Okay.  At any time after Cuker entered into this

23   agreement with your firm, did you provide notice to

24   the company that you were raising Mr. Hopkins' billing

25   rate?

 1    A.  I don't recall if I told Paul Karch about any

 2    differences in rates.  But I'm not ruling out that --

 3    Paul Karch was the attorney that I submitted the bills

 4    to.  Paul Karch reviewed all these bills and then

 5    asked for some more information on a few things.

 6              And in connection with talking him through

 7    some expenses and things, I can't rule out that we

 8    talked about Adam's.  But I didn't send him or Cuker a

 9    updated engagement letter.  But --

10    Q.  What about any kind of written notification that

11    you were going to change or increase the billing rate?

12    A.  No.  I didn't say -- send him, like, a new

13    engagement letter that said:  These are our 2019

14    rates.

15    Q.  Okay.

16    A.  I don't remember doing that.

17    Q.  So you didn't request that Cuker sign any

18    additional document agreeing to an increase in rates?

19    A.  I don't know that -- I'm trying to figure out.

20    He's listed -- I'm looking at the invoices that you

21    have here.  I appreciate that courtesy.  Adam was

22    always billed at 245 until -- there might have been

23    one invoice that he was -- let me look.

24              There's a 260 in -- there's an entry on

25    March 29th, 2017, for 260, which is $15, and then an

1    entry on April 1st.  But the preceding invoices, yeah,

2    March -- let me see how that happened if it happened.

3              Yeah, he's 240 in 2017, January, and next

4    invoice is -- well, the January invoice -- yeah,

5    between the January and the March invoice, I did not

6    send a -- a specific piece of paper that said:  We're

7    bumping up rates consistent with -- so probably what

8    happened is that we -- each year you typically

9    increase the rate, and that translated over to his

10   February bill.

11             But prior to February, I didn't

12   specifically notify him, Cuker, of that rate.  But

13   they got the bill.  They never questioned it.  Paul

14   Karch got the bill.  I mean, it was just business as

15   usual.

16   Q.  Well, did you --

17   A.  But I didn't do mine because I don't think I

18   raised my rates that year because I was --

19   Q.  But that rate just suddenly started showing up on

20   the bill, correct?

21   A.  By suddenly started showing up on a bill, I mean,

22   you've got, what, three months here where it was 260

23   and you have all these others where it was 245.  So

24   suddenly show up on a bill, I think at the beginning

25   of the year there's usually a change in attorneys'